**IT IS ORDERED as set forth below:**

**Date: September 25, 2026**

**Jeffery W. Cavender**
**U.S. Bankruptcy Court Judge**

---

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE:<br><br>DANIEL JACK, JR.,<br><br>Debtor. | CASE NO. 25-56449-JWC<br><br>CHAPTER 13 |
| DANIEL JACK, JR.,<br><br>Movant,<br><br>v.<br><br>SELECT PORTFOLIO SERVICING, INC.; TOWD POINT MORTGAGE TRUST 2020-02, U.S. BANK NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE; AND MCCALLA, RAYMER, LEIBERT, PIERCE, LLP,<br><br>Respondents. | CONTESTED MATTER |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Debtor Daniel Jack, Jr.'s Emergency Motion for Order to

Show Cause Why Defendants Should Not Be Held in Contempt for Willful Violation of the Automatic Stay (11 U.S.C. § 362) (the "Stay Violation Motion"). The Court construed the Stay Violation Motion as a request for sanctions for violations of the automatic stay by respondents Towd Point Mortgage Trust 2020-2, U.S. Bank National Association, as Indenture Trustee (the "Trust"), Select Portfolio Servicing, Inc. ("Select"), and McCalla Raymer Leibert Pierce, LLP ("McCalla," and together with the Trust and Select, the "Respondents"). After several initial hearings, the Court held a trial on the Stay Violation Motion April 22, 2026, at which Daniel Jack, Jr. ("Mr. Jack") and counsel for Respondents appeared, put on evidence, and made arguments. The Court took the matter under advisement.

Pursuant to Fed. R. Bankr. P. 7052, the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. Mr. Jack and his parents, Daniel Jack, Sr. and Rosa Jack, were the owners of Mr. Jack's residence located at 1185 To Lani Dr., Stone Mountain, Ga. 30083 (the "Property"). Mr. Jack's parents, but not Mr. Jack, borrowed money from Wachovia Bank in 2006 pursuant to a promissory note. To secure the debt, Wachovia recorded a Deed to Secure Debt with the Clerk of Superior Court for DeKalb County, GA (the "Security Deed"). The face of the Security Deed shows the signatures of Mr. Jack and his parents.

2. The Trust conducted a foreclosure sale of the Property at an auction held May 6, 2025, pursuant to the Security Deed (the "Foreclosure Sale"). The Trust was

the winning bidder at the Foreclosure Sale.

3. Mr. Jack filed a chapter 13 bankruptcy case June 10, 2025.

4. The Trust received notice of the bankruptcy soon after it was filed, and counsel entered a notice of appearance for the Trust on August 14, 2025, and again on October 3, 2025.

5. On August 1, 2025, Mr. Jack filed Adversary Proceeding No. 25-05140 (the "Adversary Proceeding") against the Respondents challenging the validity of the Security Deed and the Foreclosure Sale. McCalla filed a motion to extend time to answer in the Adversary Proceeding, and Select filed a motion to dismiss the Adversary Proceeding.

6. When Mr. Jack filed his bankruptcy case, he was employed by Amedisys, but he lost that job on or around September 4, 2025. According to a Separation Notice from Amedisys, the reason for the separation was "Unsatisfactory Performance."

7. Soon after losing his job with Amedisys, Mr. Jack received a job offer on or around September 9, 2025, but he turned it down because he did not believe he could accept it in good faith because of anxiety, insomnia, fatigue, stress, the time involved in litigating pro se, and the time spent looking for an attorney in connection with his bankruptcy case and dealings with the Respondents.

8. At a hearing in the bankruptcy case held September 30, 2025, Mr. Jack stated that extreme stress resulted in sleeplessness, exhaustion, and deficiency in his work capacity, resulting in job loss.

9. On October 22, 2025, the Trust recorded a Deed Under Power of Sale

memorializing the Foreclosure Sale (the "Deed Under Power") with the Clerk of Superior Court for DeKalb County, GA.

10. On November 13, 2025, McCalla, on behalf of the Trust, sent a demand for possession of the Property addressed to "Rosa Jack; Daniel Jack and/or All Other Occupants and/or Tenants, Known or Unknown" (the "Demand for Possession").

11. On November 18, 2025, a private process service posted a copy of the Demand for Possession on a door at the Property.

12. On December 2, 2025, the Court held a hearing in Mr. Jack's bankruptcy case at which he discussed the Demand for Possession and asserted Respondents violated the automatic stay.

13. On December 3, 2025, McCalla, on behalf of the Trust, initiated an eviction proceeding in the Magistrate Court of DeKalb County, naming Daniel Jack, Rosa L. Jack, "And All Others" occupying the Property (the "Dispossessory").

14. On December 8, 2025, the Dispossessory affidavit and summons were served by hand at the Property and by mail to the Property.

15. On December 9, 2025, Mr. Jack filed a Suggestion of Bankruptcy and Notice of Automatic Stay in the Dispossessory. He also filed the Stay Violation Motion the same day requesting emergency relief.

16. On December 11, 2025, McCalla, on behalf of the Trust, filed a dismissal of the Dispossessory without prejudice.

17. On December 16, 2025, the Court held an initial hearing on the Stay Violation Motion. At the hearing Mr. Jack confirmed that the Trust dismissed the

Dispossessory, and the Court determined the matter was not emergent and required an evidentiary hearing.

18. On January 9, 2026, the Court dismissed Mr. Jack's bankruptcy case and the Adversary Proceeding. Mr. Jack appealed the orders and filed motions to stay pending the appeal, which the Court denied.[1]

19. Mr. Jack resided at the Property during the entirety of his bankruptcy case and through the day of the trial.

20. Select sent a Form 1099-A to Daniel Jack at the Property[2] for tax year 2025. The face of the Form 1099-A indicates that the "lender," defined as Select, acquired the Property November 5, 2025.

21. On March 24, 2026, Select sent an Annual Escrow Account Disclosure Statement (the "Escrow Statement") addressed to "Daniel L Jack" and Rosa Jack at the Property.

22. At the hearing, Mr. Jack offered testimony related to his damages. He testified that he has spent over 800 hours in a state of "hypervigilance" since the Dispossessory, including time spent drafting the Stay Violation Motion and time

---

[1] Since the trial the District Court upheld the orders dismissing the bankruptcy case and Adversary. *See Jack v. Whaley,* 26-CV-00427-VMC, Doc. Nos. 11 and 12 (N.D. Ga. June 23, 2026); *Jack v. Select Portfolio Serv., Inc.*, 26-CV-00422-VMC, Doc. Nos. 14 and 15 (N.D. Ga., June 23, 2026). Mr. Jack further appealed those orders to the Eleventh Circuit. Mr. Jack also had a separate lawsuit and appeal pending during the bankruptcy case. *See Jack v. Select Serv. Portfolio, Inc., et al*, USCA11 Case No. 25-12233 (11th Cir.), appealing *Jack v. Select Servicing Portfolio, Inc.*, Case No. 25-CV-02477-VMC (N.D. Ga.). The appellate case was dismissed January 15, 2026, soon after the Court dismissed the bankruptcy case.

[2] Select mailed the Form 1099-A to the Property, but the Form does not specify between Daniel Jack, Jr. (the Debtor) and Daniel Jack, Sr. (Debtor's father). Both Jr. and Sr. held ownership interests in the Property, but only Sr. was personally obligated on the underlying debt.

diverted from work. Mr. Jack did not provide any testimony or evidence specifying how many hours he devoted specifically to Respondents' alleged stay violations. Mr. Jack further offered testimony about emotional distress, including stress, anxiety, sleeplessness, and fatigue. Although Mr. Jack offered some testimony about specific distress resulting from the Demands for Possession and Dispossessory, the evidence made clear that he experienced similar emotional distress related to his bankruptcy case generally, the Adversary Proceeding, and his ongoing disputes and litigation with Respondents that have no direct connection to any alleged stay violations.

23. Mr. Jack attempted to offer his own expert testimony about his emotional distress, but the Court did not admit him as an expert after objection by Respondents. Mr. Jack testified that he and his wife received relentless phone calls, texts, and other solicitations after the Dispossessory was filed.

24. At the hearing, Mr. Jack offered the testimony of Ralph John in support of damages. Mr. John is a close friend of Mr. Jack and has known him since 2008. Mr. John testified about his interactions with Mr. Jack prior to the ongoing dispute with Respondents and at various points during the bankruptcy case. He testified that he visited Mr. Jack's house or otherwise spent time with Mr. Jack often during October and November of 2025. He testified that he was at Mr. Jack's house the day that Mr. Jack learned that the Deed Under Power was recorded, and he described Mr. Jack's reaction. He also testified to changes he perceived in Mr. Jack's behavior and his concern for his friend during the bankruptcy case. Mr. John was not with Mr. Jack when Mr. Jack learned of the Dispossessory, but after the Dispossessory he observed

that Mr. Jack was nervous about having visitors to his house for fear of being served with dispossessory papers and instructed Mr. John not to come to his house without advance warning. He also provided testimony about the changes he observed in Mr. Jack following the Dispossessory, stating that things got worse, that it affected his relationship with his children, it became difficult for Mr. Jack to function on a day-to-day basis, and his energy level has been down. On cross-examination, Mr. John stated that he was not aware that the Dispossessory was dismissed on December 11, 2025, or that it was not pending as of the day of the trial.

25. At the hearing, the attorney who filed the Dispossessory, Andru Powers, testified about the events leading to the filing of the Dispossessory. She described the procedure employed by McCalla to check for bankruptcy filings to determine whether the automatic stay is in place before filing a dispossessory. She testified, among other things, that an automated system checks for PACER hits during the intake process. Mr. Jack's name and social security number generated positive PACER hits during the process, and she testified that three human errors occurred. First, the positive PACER hit should have caused an "eviction specialist" assigned to the case to place the positive results in an attorney review queue, which would have created a "soft hold." For unknown reasons that did not occur. Second, the positive hit was not included in the complaint package. Again, it is unclear why this happened. Third, Ms. Powers failed to manually review the matter because, although she printed the complaint package and intended to review it manually, she got distracted, put it aside, and forgot to review it.

26. She testified the firm has implemented two changes to its process to

address the errors. First, when the automated PACER search generates a positive result, the matter is automatically put into the attorney review queue. Second, complaint packages cannot be generated unless a PACER search has been run within 24 hours.

27. She testified that she did not intend to violate the automatic stay by filing the Dispossessory. She testified that the client, SPS or the Trust, generated the referral to her firm but that clients do not expect the firm to file dispossessory cases if they are not allowed to file them, and clients expect the firm to run PACER searches and investigate other matters, such as military status, to determine whether dispossessory cases are allowed to proceed. She testified that she had no direct communication with the client regarding Mr. Jack's bankruptcy case. She further testified that she filed the dismissal of the Dispossessory immediately after personally receiving Mr. Jack's indication of bankruptcy filed in the Dispossessory.

## II. CONCLUSIONS OF LAW

This Court has jurisdiction over this matter under 28 U.S.C. § 1334. Venue is proper in this Court under 28 U.S.C. § 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

When Mr. Jack filed his bankruptcy case, the automatic stay under 11 U.S.C. §362(a) went into effect. "[A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k). "A party seeking damages for a stay violation must establish that: (1) a violation

occurred; (2) the violation was committed willfully; and (3) the violation caused actual damages." *Gordon v. Hill (In re Wilson)*, 454 B.R. 546, 550 (Bankr. N.D. Ga. 2011) (citing *Hampton v. Yam's Choice Plus Autos, Inc., (In re Hampton),* 319 B.R. 163, 170–71 (Bankr. E.D. Ark. 2005). The party seeking damages bears the burden of proof by a preponderance of the evidence. *Spinner v. Cash In a Hurry, LLC (In re Spinner)*, 398 B.R. 84, 94-95 (Bankr. N.D. Ga. 2008); *Roche v. Pep Boys, Inc. (In re Roche)*, 361 B.R. 615, 624 (Bankr. N.D. Ga. 2005). A stay violation is "willful" if the party (1) knew the automatic stay was invoked and (2) intended the actions which violated the stay. *In re Allied Holdings, Inc.*, 355 B.R. 372, 378 (Bankr. N.D. Ga. 2006) (citing *Jove Eng'g, Inc. v. IRS*, 92 F.3d 1539, 1554 (11th Cir. 1996)). "The defendant must have actual notice of the stay for the violation to be willful. . . . However, proof of the defendant's intent to violate the stay is not required, only the defendant's intent to act must be shown." *In re Roche*, 361 B.R. at 622 (citations omitted).

**A. <u>Did Respondents Violate the Automatic Stay?</u>**

The Court first addresses whether the Respondents committed any stay violations. Mr. Jack asserted several potential stay violations: (1) notarizing and recording the Deed Under Power; (2) sending the Demand for Possession; (3) filing the Dispossessory; and (4) actions related to insurance on the Property.

1. <u>Recording the Deed Under Power Did Not Violate the Stay</u>

The Court finds that notarizing and recording the Deed Under Power did not violate the automatic stay. As the Court has ruled in other orders in this case, Georgia law is clear that a debtor's right of redemption under a deed to secure debt terminates

when the lender accepts a winning bid at a foreclosure sale, property sold at a foreclosure sale does not become property of the bankruptcy estate in any subsequently filed case even if the deed under power has not yet been recorded when the case is filed, and any subsequent delivery and/or recording of the deed under power post-petition does not violate the automatic stay.[3]

Mr. Jack has never disputed, and did not dispute at trial, that the Trust conducted a foreclosure auction of the Property on May 6, 2025, at which the Trust was selected as the winning bidder. Mr. Jack's arguments are that 1) his interest in the Property did not terminate until the Trust recorded the Deed Under Power, and 2) the Security Deed was invalid due to notary fraud, rendering the Foreclosure Sale invalid. As discussed, the Court has already rejected the first argument and does so again. Mr. Jack's presentation of the 1099-A Form at trial, the face of which indicates that Select acquired an interest in the Property in November of 2025, does not change the Court's conclusion that *Georgia law* dictates that *Mr. Jack's* interest in the Property terminated at the Foreclosure Sale.[4]

---

[3] *See, e.g., Meadows v. Patel (In re Meadows)*, Case No. 25-64063-PMB, 2026 WL 1507733, *3 (Bankr. N.D. Ga. May 28, 2026) ("As this Court has previously explained, once a foreclosure sale is concluded and the successful bid accepted, the debtor no longer retains a legal or equitable interest in the property sufficient to bring it into the bankruptcy estate under 11 U.S.C. § 541."); *Lariscey v. MEB Loan Trust II (In re Lariscey)*, 2022 WL 789449 (Bankr. S.D. Ga. 2022) (discussing issue and citing cases); *Taylor v. Wells Fargo Bank, N.A. (In re Taylor)*, Case No. 16–69706–PMB, AP No. 17–5253, 2018 WL 1267998 (Bankr. N.D. Ga. March 8, 2018) (concluding that accepting winning bid at foreclosure sale terminates debtor's right of redemption and recording deed under power post-petition does not violate automatic stay).

[4] Neither party developed any significant argument relative to the Form 1099-A or submitted any authority related to the Form 1099-A, and the Court has found no authority addressing the relevance of a Form 1099-A to the question of when a borrower's interest in property is terminated during the foreclosure process or whether such property becomes property of a bankruptcy estate. The IRS instructions to Form 1099-A provide, "File Form 1099-A,

As to the second argument, assuming Mr. Jack could prove his claims related to a fraudulent notary signature on the Security Deed, an invalid notary signature does not void the Security Deed or render it unenforceable; rather, attestation defects affect the *recordability* of the Security Deed. *See Burgos v. Sand Canyon Corp.*, 813 Fed.Appx. 363, 367 (11th Cir. 2020) (unpublished). "Georgia law is clear that an allegation that a deed was improperly witnessed 'is insufficient to void the deed to secure debt, since a deed without attestation conveys the title as against the grantor and his heirs.'" *Id.* (citing *Budget Charge Accounts, Inc. v. Peters*, 213 Ga. 17, 96 S.E.2d 887, 889 (1957)). Mr. Jack provided no evidence to establish that the Foreclosure Sale was invalid or that the Property became property of the bankruptcy estate after the Foreclosure Sale. To the extent any Respondent notarized, delivered, or recorded the Deed Under Power post-petition, such actions did not violate the automatic stay.

---

Acquisition or Abandonment of Secured Property, for each borrower if you lend money in connection with your trade or business and, in full or partial satisfaction of the debt, you acquire an interest in property that is security for the debt, or you have reason to know that the property has been abandoned." *Instructions for Forms 1099-A and 1099-C*, INTERNAL REVENUE SERV. (Apr. 2025) https://www.irs.gov/instructions/i1099a. For the date of acquisition, the instructions provide, "If you purchase the property at a sale held to satisfy the debt, such as at a foreclosure or execution sale, use the *later* of the date of sale or the date the borrower's right of redemption, if any, expires." *Id.* (emphasis added). Form 1099-A is "wholly informational" and creates no tax liability in and of itself. *See Carr v. Ocwen Loan Serv., LLC*, 16-CV-04036-AT, 2017 WL 11495239, *5 (N.D. Ga. June 27, 2017), and this wholly informational document sent pursuant to IRS instructions does not change Georgia law as to when Mr. Jack's right of redemption terminated or what constitutes property of the estate under § 541. The Court does not find the fact that the Form 1099-A presented by Mr. Jack shows an acquisition date in November (post-petition) to be inherently in conflict with the conclusion that Mr. Jack's right of redemption terminated prepetition. Under Georgia law, the right of redemption expires at the foreclosure auction, but the transaction between the lender and the purchaser is not completed "[u]ntil a deed under power is transferred and consideration is passed." *In re Lariscey* at *3 (citing *Tampa Inv. Grp., Inc. v. Branch Banking & Tr. Co., Inc.*, 723 S.E.2d 674, 677 (Ga. 2012)).

2. <u>The Demand for Possession and Dispossessory Violated the Stay</u>

The Court concludes the Demand for Possession and the Dispossessory filing each violated the automatic stay. Although Mr. Jack's ownership rights in the Property terminated prepetition, he continued to reside in the Property and held a possessory interest as of the petition date and at the time of the Demand for Possession and the Dispossessory. The Court agrees with cases finding that the automatic stay protects a debtor's possessory interest in property even if the property is not property of the estate, and that efforts to dispossess the debtor of such property violate the automatic stay.[5] Thus, the Court finds that sending the Demand for Possession and filing the Dispossessory constituted violations of the automatic stay. The evidence, however, establishes only that the Trust and McCalla were involved in the Demands for Possession and Dispossessory, and there is no evidence that Select had any involvement in those actions. The Court therefore finds that the Trust and McCalla, but not Select, violated the automatic stay by sending the Demands for Possession and filing the Dispossessory.

The Court further concludes that the stay violations were willful. The Trust had knowledge of the bankruptcy case no later than August 14, 2025, when its counsel entered a notice of appearance in the bankruptcy case; McCalla had knowledge of the bankruptcy case no later than August 29, 2025, when it entered a notice of appearance in the Adversary Proceeding. The stay violations occurred in November and December,

---

[5] *See, e.g., In re Meadows*, 2026 WL 1507733 at *5 ("Even where a debtor no longer holds legal title to real property, a debtor's continued possessory interest is protected by the automatic stay." (citing *In re Coates*, 108 B.R. 823, 825-26 (Bankr. M.D. Ga. 1989))).

well after the Trust and McCalla had actual knowledge of the bankruptcy case. Therefore, the stay violations were willful.

Both parties, however, cured the violations by causing the Dispossessory to be dismissed on December 11, 2025. At one point during the trial, it appeared that Mr. Jack argued that because the Dispossessory was dismissed without prejudice, the stay violation somehow continued after the dismissal. To the extent that was Mr. Jack's argument, the Court disagrees. The Dispossessory was dismissed on December 11, 2025, and a dismissal without prejudice merely preserves the right to bring a new dispossessory action in the future. The Court sees no continuing stay violation there.

3. <u>There Is Insufficient Evidence to Show a Stay Violation in Relation to Insurance</u>

The Court finds that Mr. Jack has not satisfied his burden of establishing a stay violation related to insurance on the Property. Mr. Jack made arguments about the Trust interfering or causing the termination of insurance on the Property post-petition, and he asserts that the Trust caused excessive force-placed insurance to be placed on the Property, but Mr. Jack provided minimal evidence related to the insurance issues. Mr. Jack testified about conversations with his insurance agent and offered emails between him and his insurance agent, but the substance of the insurance agent's statements are hearsay, and it is not clear to the Court what happened with the insurance or when. It appears that the insurance was canceled by the insurance company at some point during the bankruptcy case, but it is unclear why or that it was canceled because of any actions by Respondents. Further, the Court has ruled that Mr. Jack had no interest in the Property other than possession when he filed the

bankruptcy case, and it is not clear to the Court how interference with insurance policies on a Property that was not property of the estate constitutes a stay violation. If the Trust or Select attempted to collect force-placed insurance premiums against Mr. Jack personally on a post-petition basis, then such actions could, theoretically, constitute a stay violation, but the Court has no evidence that such collection attempts occurred while the bankruptcy case was pending. Mr. Jack may have valid state law claims related to the insurance issues (the Court expresses no opinion on those matters), but the Court does not find sufficient evidence to establish that Respondents violated the automatic stay as it relates to any insurance on the Property.

4. <u>There Is No Evidence of Other Stay Violations</u>

Finally, the Court concludes that there is no evidence of any other stay violations. Mr. Jack testified and argued that the Respondents have persistently acted in bad faith during his case by refusing to accept mortgage payments, shifting their positions, and "falsely" asserting a foreclosure took place. Mr. Jack testified that he had discussions with representatives of the Trust or Select during the bankruptcy case in which they stated the mortgage account remained active and could be paid, but the Trust and/or Select later changed positions and would not accept payments because of the Foreclosure Sale. The Court is further aware from the record in the bankruptcy case that the Trust and/or Select indeed shifted positions during the bankruptcy case. Initially the Trust filed a proof of claim and a plan objection indicating the mortgage account was still active. The Trust later changed its position, asserting that the Foreclosure Sale occurred prepetition and the Property never became property of the

bankruptcy estate. The Trust attempted to withdraw its proof of claim[6] and withdrew its initial plan objection. It then filed an objection asserting the Property was not property of the bankruptcy estate. Thus, the Court has no reason to doubt that the Trust and/or Select may have initially discussed payment options with Mr. Jack before refusing to accept any payment, and the Court understands Mr. Jack's consternation with this change in position during the case. But the Court does not see how such changes in position violated the automatic stay. What was evident to the Court during the bankruptcy case was that the Trust, Select, and its multiple counsel[7] failed to properly communicate and coordinate in connection with Mr. Jack's bankruptcy case, but the Court does not equate a change in factual and legal position with a stay violation.

Nor does the Court find any evidentiary support for Mr. Jack's assertions that the Trust "falsely" alleged the Foreclosure Sale occurred. Mr. Jack has never presented anything to contradict the evidence that the Foreclosure Sale occurred in May. He has challenged the *legal effect* of the Foreclosure Sale, arguing that he still had an interest in the Property until the Deed Under Power was recorded, offering the Form 1099-A as evidence. But as discussed multiple times in this opinion, other orders in the bankruptcy case, and on the record at multiple hearings, the Court disagreed with Mr.

[6] Because Mr. Jack filed an adversary proceeding against the Trust, he has argued that the Trust could not withdraw its proof of claim without an order from the Court after notice and a hearing pursuant to Fed. R. Bankr. P. 3006. Although Mr. Jack is correct that the Trust could not withdraw its claim without an order from the Court, filing a withdrawal of the proof of claim does not violate the stay.

[7] McCalla was not the only counsel that represented the Trust during the bankruptcy case.

Jack's repeated arguments that his ownership interest in the Property continued until the Deed Under Power was recorded, and the Court does not agree that Respondents "falsely" alleged that a Foreclosure Sale occurred in May.

Finally, to the extent Select sent the Escrow Analysis in March of 2026, the Court finds it baffling that Select would send such a document nearly a year after the Foreclosure Sale and given the history of this bankruptcy case, but the bankruptcy case was closed when it was mailed and there was no automatic stay in place to violate. Further, the Escrow Analysis is addressed to Daniel Jack, and it is not clear if that is intended to be addressed to Mr. Jack, who was not an obligor on the underlying debt, or his father, who has never been in bankruptcy as far as the Court is aware. The Escrow Analysis did not violate the automatic stay.

In sum, the Court finds that the Trust and McCalla willfully violated the automatic stay by sending the Demand for Possession in November, 2025, and by filing the Dispossessory in December, 2025. The Trust and McCalla both cured the Stay Violations by dismissing the Dispossessory on December 11, 2025. The Court finds no other stay violations.

**B. <u>Damages</u>**

Mr. Jack is entitled to actual damages, including costs and attorneys fees, resulting from the Demands for Possession and Dispossessory. Actual damages are defined as "real, substantial and just damages or the amount awarded to a complainant in compensation for [his] actual and real loss or injury, as opposed to nominal damages and punitive damages." *In re Roche*, 361 B.R. at 624. (citing *McMillian v. FDIC*, 81 F.3d

1041, 1054 (11th Cir. 1996)). "Actual damages must be prove[n] with reasonable certainty, and mere speculation, guess or conjecture will not suffice." *Castillo v. Three Aces Auto Sales, (In re Castillo)*, 456 B.R. 719, 725 (Bankr. N.D. Ga. 2011). Further, "the debtor must demonstrate that actual damages were 'proximately caused by and reasonably incurred as a result of the violation of the automatic stay.'" *Dawson v. RAM Motors, LLC (In re Dawson)*, 665 B.R. 796, 804-05 (Bankr. S.D. Ohio 2025).

1. There Is Insufficient Evidence to Establish Out-of-Pocket Expenses

Mr. Jack offered limited evidence of out-of-pocket costs he incurred in connection with the stay violations. He is not represented by counsel, and he offered no evidence of any attorneys' fees incurred in connection with the stay violations. He attempted to testify that he incurred "thousands" in expenses for filing costs, transcripts, printing, and transportation, but the Court sustained an objection to that testimony for lack of foundation. He also attempted to submit bank statements and receipts showing expenses for court transcripts, mailing expenses, and filing fees, but the Court did not admit those documents on Respondents' relevance objection because they related to costs incurred in connection with other matters in his bankruptcy case and other litigation, such as the cost of appealing the Court's order dismissing the bankruptcy case. Mr. Jack failed to tie the expenses with the Demands for Possession, Dispossessory, or litigating the Stay Violation Motion. The Court finds Mr. Jack did not satisfy his burden of establishing any out-of-pocket expenses related to the stay violations.

2. <u>There Is No Causal Connection Between Stay Violations and Lost Wages</u>

Mr. Jack asserted damages for lost employment or wages beginning September 2025 to March 2026. He lost his job at Amedisys in early September—over two months before the first stay violation occurred in mid-November. The stay violations could not have caused Mr. Jack's loss of employment at Amedisys.

Mr. Jack further argued that he has devoted so much time to this case, and it has caused him so much emotional distress, that he has not been able to work since losing his job at Amedisys. But he testified that the stress and time spent litigating caused him to turn down a job offer on or around September 9—over two months before the stay violations. The Court cannot conclude that Mr. Jack's inability to work was caused by the stay violations; instead, they appear to be the result of the overall stress and time related to Mr. Jack's bankruptcy case and other litigation and claims he alleges against the Respondents.

Mr. Jack asserted at trial that his job loss was not the result of the bankruptcy process but, "as I testified on the record on September 30[, 2025], my extreme stress, sleeplessness, and job loss were the direct result of the Respondents' relentless bad faith. Specifically, they refused to accept my mortgage payments, constantly shifted their legal positions, and falsely claimed a foreclosure sale occurred in May of 2025." As discussed above, the Court does not accept that these acts constitute stay violations, and Mr. Jack has not established that his inability to work beginning in September was caused by any stay violation.

3. There Is Insufficient Evidence to Establish Damages for Time Spent Resolving Stay Violations

Mr. Jack testified that he has spent over 800 hours "in a state of hypervigilance" from the Dispossessory through March of 2026, including time spent drafting the Stay Violation Motion and time diverted from work. Mr. Jack requested $80,000 for this time based on an estimated $100 per hour for the value of his labor. The Court finds these requested damages to be speculative and unreasonable. Mr. Jack filed the Stay Violation Motion December 9, the day after he learned of the Dispossessory, and the Court held a short hearing on December 16 at which everyone agreed the Dispossessory was dismissed, causing the Court to conclude the matter was not emergent. Although Mr. Jack likely devoted significant time preparing for the trial, 800 hours is not a reasonable or plausible amount of time for such preparation, and Mr. Jack offered no testimony or evidence to establish how much time he spent preparing the Stay Violation Motion, attending the initial hearings, or preparing for the trial. He testified that he was in a state of hypervigilance, in part because the dismissal was without prejudice. As discussed, however, the non-prejudicial nature of the dismissal did not constitute an ongoing stay violation, and the Court finds damages for "hypervigilance" after the stay violation ended to be speculative or conjectural in nature.[8] As for time diverted from work, as discussed above, the evidence showed that Mr. Jack turned down a job at least two months prior to the first stay violation because of the time he was already devoting to his bankruptcy and related litigation, and the Court cannot conclude that the

[8] Mr. Jack's testimony about hypervigilance sounds more like emotional distress, which the Court discusses below.

Demand for Possession or Dispossessory was the cause of Mr. Jack's loss of work. Assuming Mr. Jack's time is compensable for resolving the stay violations, the Court simply has no evidence from which it could determine how much time Mr. Jack actually spent on the stay violation matters, and the Court concludes there is insufficient evidence to establish any damages for the value of Mr. Jack's time.

4. <u>There Is Evidence of Emotional Distress Damages</u>

Mr. Jack requests emotional distress damages. The Eleventh Circuit has made clear that emotional distress damages are included within the broad term of "actual damages" in § 362(k). *See Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 1271 (11th Cir. 2014). The Eleventh Circuit cautioned, though, that not every willful violation of the stay merits compensation for emotional distress. At a minimum, to recover actual damages for emotional distress under § 362(k), a plaintiff must

(1) suffer significant emotional distress,

(2) clearly establish the significant emotional distress, and

(3) demonstrate a causal connection between that significant emotional distress and the violation of the automatic stay.

*Lodge*, 750 F.3d at 1271 (citing *Dawson v. Washington Mutual Bank, F.A. (In re Dawson)*, 390 F.3d 1139, 1149 (9th Cir. 2004)). Normally, the testimony of the plaintiff alone is not sufficient to establish significant emotional distress, and a plaintiff must provide corroborating evidence. *In re Steed*, 2021 WL 1186482, at *8 (Bankr. N.D. Ga. Mar. 26, 2021), *aff'd sub nom. Steed v. GSRAN-Z, LLC*, 2022 WL 1907593 (N.D. Ga. Apr. 22, 2022). A debtor may establish emotional distress damages through

corroborating medical evidence or non-expert testimony of family, friends, or co-workers. *Lodge*, 750 F.3d at 1271 (citing *In re Dawson*, 390 F.3d at 1149). "'In some cases significant emotional distress may be readily apparent even without corroborative evidence,' such as where 'the violator may have engaged in egregious conduct.'" *Id.*

After considering the evidence at trial and the testimony of Mr. Jack and corroborating testimony of Mr. John, which the Court found to be sincere and credible, the Court concludes that Mr. Jack established significant emotional distress resulting from the Demand for Possession and Dispossessory, but not to the extent Mr. Jack asserts. The testimony and other evidence made clear that Mr. Jack has experienced significant distress throughout his bankruptcy case and related litigation with Respondents, but Mr. Jack is not entitled to damages for distress caused by the bankruptcy case and other litigation. He is entitled only to significant emotional distress caused by the stay violations. The testimony and evidence provided make it difficult to distinguish between the distress caused by the bankruptcy case and related litigation, and the distress caused specifically by the stay violations.

Mr. John, for example, gave clear and convincing testimony about his first-hand account of Mr. Jack's distress on the day he learned that the Deed Under Power was recorded. He also gave sincere testimony about the overall effect that the foreclosure, bankruptcy, and related litigation have had on Mr. Jack. That testimony, however, does not support an award of damages for emotional distress caused by the stay violations. His testimony about Mr. Jack's distress specifically related to the Demand for Possession and Dispossessory was more general in nature and not grounded in any

specific first-hand account like his testimony about the Deed Under Power. Further, Mr. John was not aware that the Dispossessory was dismissed just a few days after it was filed, and it is difficult to know if his testimony about the Dispossessory-specific distress related to the time period during which the stay violation was ongoing, or if it was more generalized to the entire time period beginning on the date the Dispossessory was filed and extending all the way to the trial. That said, he offered some testimony that could be pinpointed to the Dispossessory itself, such as Mr. Jack asking Mr. John not to come to Mr. Jack's house without advanced notice for fear that someone arriving at his house without warning might be a sheriff or other person coming to evict him. That testimony corroborated Mr. Jack's testimony that after the Dispossessory he was in a state of "hypervigilance" and that any person arriving at his house caused him stress. The Court therefore concludes that Mr. John's testimony established a causal connection between some of Mr. Jack's emotional distress and the Demand for Possession and Dispossessory.

Mr. Jack's testimony about his emotional distress, indeed his damages in general, appeared to span a broad range of time beginning with the loss of his job in September and continuing long past the date the Dispossessory was dismissed. Mr. Jack's overall presentation of damages and distress often made little effort to distinguish between distress that he experienced before the stay violations, during the stay violations, and after the stay violations were cured. He argued that all such distress was relevant because of the cumulative effect when the Dispossessory was filed. The Court can appreciate that argument to some degree, but it is not appropriate to

award damages for emotional distress that was not caused by the stay violations, and Mr. Jack's arguments strike the Court as an attempt to leverage the generalized distress of bankruptcy and related litigation into a larger damage award for circumscribed stay violations.

The Demand for Possession was sent November 13, 2025, and the Dispossessory was filed December 3. Mr. Jack learned of the Dispossessory December 9, and the Dispossessory was dismissed December 11. Although the Court can appreciate a lingering effect of the Dispossessory, and that his distress related specifically to the Dispossessory might have been exacerbated by previous stress, the Court must focus its inquiry into damages caused by the stay violation itself, and not conflate the generalized, albeit significant, distress attendant to nearly every bankruptcy case and litigation.

The Court is satisfied that Mr. Jack established that the Demand for Possession and the Dispossessory caused him significant emotional distress in addition to the other distress he was experiencing. Placing a dollar figure on such distress, however, is difficult. Mr. Jack requested total emotional distress damages in the amount of $100,000, but he offered no explanation of how he derived that number, and the Court believes that number was calculated in reference to all the distress Mr. Jack has experienced in connection with his bankruptcy case and related litigation, and the specific distress caused by the Demand for Possession and Dispossessory is much smaller. The Court concludes that $10,000 is an appropriate amount of damages for the emotional distress caused specifically by the Demand for Possession and Dispossessory.

5. The Evidence Does Not Support a Finding of Punitive Damages

Punitive damages may be awarded under appropriate circumstances under 11 U.S.C 362(k). Such appropriate circumstances arise where the creditor has acted with maliciousness or in bad faith. *In re Castillo*, 456 B.R. at 725. For an award of punitive damages, courts consider the following factors:

(1) the nature of the defendant's conduct;

(2) the nature and extent of the harm to the plaintiff;

(3) the defendant's ability to pay;

(4) the motives of the defendant; and

(5) any provocation by the debtor.

*In re Roche*, 361 B.R. at 624. The Court does not find this case to merit an award of punitive damages. Ms. Powers' testimony established, without any countervailing evidence, that the filing of the Dispossessory was the result of several mistakes made by individuals at McCalla, not any bad faith, maliciousness, or other circumstances meriting a finding of punitive damages. To be sure, Ms. Powers' testimony did not fully explain why the referral for the Dispossessory was made in the first place by the Trust, or why the Demand for Possession was sent in mid-November, but there is no evidence to suggest that either McCalla or the Trust made a conscious decision to ignore the automatic stay or that the Demand for Possession and Dispossessory were done in bad faith or with any malicious intent towards Mr. Jack. Ms. Powers caused the Dispossessory to be dismissed as soon as she learned of Mr. Jack's bankruptcy, and no further stay violations occurred. Further, Ms. Powers testified that McCalla has

implemented changes to its processes and procedures in an effort to address the mistakes made in this case. The evidence established that mistakes were made, and steps were taken to address the mistakes; the evidence did not establish any bad faith or maliciousness by the Respondents. The Court declines to award punitive damages.

For the foregoing reasons,

**IT IS ORDERED** that the Stay Violation Motion is GRANTED as follows: Daniel Jack, Jr. is awarded $10,000 in actual damages against the Trust and McCalla for willfully violating the automatic stay. All other relief requested in the Stay Violation Motion is DENIED.

The Clerk's Office is directed to serve a copy of this Order upon the Debtor, the Chapter 13 Trustee, and counsel of record for the Trust, Select, and McCalla.

**END OF DOCUMENT**